UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

LONNIE JOHNSON,

                          Plaintiff,

        -against-                                    5:15-CV-1193 (LEK/ATB)

SUMMIT ACQUISITIONS, LLC, *et al.*,

                          Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Lonnie Johnson has brought this action against former employer Summit

Acquisitions, LLC ("Summit"), as well as Summit owners and executives Thomas Strait and

Steve Barcus, alleging hostile work environment, employment discrimination based on race, and

retaliation against Plaintiff for protected activity, in violation of Title VII of the Civil Rights Act

of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*; the Civil Rights Act of 1866, 42 U.S.C. § 1981,

and New York State Human Rights Law ("NYSHRL"), New York Executive Law § 296. Dkt.

No. 55 ("Second Amended Complaint" or "SAC"). Defendants have since brought counterclaims

for breach of duty of loyalty; conversion; and violation of the faithless servant doctrine. Dkt. No.

56 ("Answer and Counterclaims") ¶¶ 122–54.

Now before the Court are Defendants' and Plaintiff's motions for partial summary

judgment. Defendants move for summary judgment and dismissal of Plaintiff's retaliation

claims. Dkt Nos. 91 ("Defendants' SJ Motion"), 91-2 ("Defendants' SJ Mem"), 105-1

("Defendants' Reply"), 91-1 ("Defendants' Statement of Material Facts" or Defendants' SMF"),

91-3 ("Strait Affidavit I"), 91-4 through 91-12 ("Strait I Exhibits"), 91-12 ("Thorpe Declaration

I"), 91-13 through 91-26 ("Thorpe I Exhibits"). Plaintiff opposes Defendants' SJ Motion. Dkt

Nos. 98 ("Plaintiff's Response"), 100 ("Plaintiff's Opposition SMF"). Defendants also move for summary judgment with respect to liability on their counterclaims for (1) breach of duty of loyalty and (2) violation of the faithless servant doctrine. Defs.' SJ Mem. at 5, 21–28;[1] Defs.' Reply at 12–13.

Plaintiffs cross-move for summary judgment and dismissal of all three of Defendants' counterclaims. Dkt No. 93 ("Plaintiff's SJ Motion"), 93-2 ("Plaintiff's SJ Memorandum"), 107 ("Plaintiff's Reply"), 93-1 ("Plaintiff's SMF"), 93-5 ("McIntyre Declaration"), 93-6 through 93-26 ("McIntyre Exhibits"). Defendants' oppose Plaintiff's SJ Motion, except as to Defendants' conversion counterclaim. Dkt. No. 102-1 ("Defendants' Response"), 102 ("Defendants' Opposition SMF") at 18–29.

Also before the court is Plaintiff's motion for sanctions, Pl's SJ Mem. at 13–18 ("Sanctions Motion"), which Defendants oppose, Defs.' Resp. at 7–19.

For the reasons that follow, Defendants' SJ Motion is granted as to Plaintiff's retaliation claims, which are dismissed, but denied in all other respects. Plaintiff's SJ Motion is granted as to the conversion counterclaim, which is dismissed, but denied in all other respects. Plaintiff's motion for sanctions is denied, but Plaintiff is granted leave to renew its motion for sanctions at or after trial.

## II.   BACKGROUND

### A. Plaintiff's Employment with Summit

Unless otherwise specified, the facts below are not disputed by the parties. Summit operates rental housing units in multiple states, including New York. Defs.' SMF ¶ 1; Pl.'s

---

[1] Cited page numbers refer to those generated by the Court's Electronic Filing System ("ECF") unless otherwise noted.

Opp'n SMF ¶ 1. Strait is an owner and President of Summit; Barcus was previously an owner and President of Summit. Strait Aff. I ¶ 1; Answer ¶ 9.

Summit's apartment complex in Syracuse, NY ("Summit Apartments") is a multi-building apartment complex consisting of 108 units within five different buildings. Defs.' SMF ¶¶ 2–3; Pl.'s Opp'n SMF ¶¶ 2–3. Fourteen of these apartments are market rate, and the remainder are subsidized by the federal government for low-income tenants. Defs.' SMF ¶ 4; Pl.'s Opp'n SMF ¶ 4; Pl.'s SMF ¶ 2; Defs.' Opp'n SMF ¶ 2.

In August 2008, Summit hired Plaintiff, a black man, as a part-time receptionist and office worker at Summit Apartments. Defs.' SMF ¶ 5; Pl.'s Opp'n SMF ¶ 5; Pl.'s SMF ¶¶ 1–2; Defs.' Opp'n SMF ¶¶ 1–2. In 2011, when then-property manager Elisa Bates left her job at Summit Apartments, Summit promoted Plaintiff to Property Manager at Summit Apartments. Defs.' SMF ¶ 6; Pl.'s Opp'n SMF ¶ 6. As Property Manager, Plaintiff's job responsibilities included overseeing day-to-day operations of the Summit Apartments; supervising maintenance employees and office personnel; interacting with state and local government officials to ensure compliance with code enforcement; managing tenant collections and project expenses; and ensuring compliance with U.S. Department of Housing and Urban Development ("HUD") requirements. Defs.' SMF ¶ 7; Pl.'s Opp'n SMF ¶ 7.

In March 2013, Summit hired Robert Dominick as Maintenance Supervisor at Summit Apartments. Defs.' SMF ¶ 8; Pl.'s Opp'n SMF ¶ 8. Within a few weeks, however, Dominick was terminated from his position for making racially offensive remarks about Plaintiff. Defs.' SMF ¶ 9; Pl.'s Opp'n SMF ¶ 9.

As the basis of his hostile work environment and race discrimination claims (which the parties have not moved for summary judgment on), Plaintiff alleges that Strait repeatedly

referred to Plaintiff as a "nigger" and used racist language about black people in general; paid Plaintiff less than the prior, non-black property manager; gave Plaintiff fewer employees to assist him because of Plaintiff's race and in order to set Plaintiff up to fail; fired another employee because of her biracial child; and finally fired Plaintiff, replacing him with a less experienced white employee. SAC ¶¶ 19, 21, 25– 27, 29, 32–33, 36, 38, 39, 41, 46–48, 50, 52, 54.

While Plaintiff was employed as property manager for Summit Apartments, he also performed certain work on behalf of Gurbach Saluja and his son Ravi Saluja, who also owned rental units in Syracuse. Defs.' SMF ¶ 10; Pl.'s Opp'n SMF ¶ 10. The parties dispute the extent of the work Plaintiff performed for the Salujas and when he did it. Id. Defs.' SMF ¶ 10; Pl.'s Opp'n SMF ¶ 10. According to Defendants, between 2011 and 2014, during "some" of the hours for which he was being paid to work for Summit, and using the office and computer belonging to Summit, Plaintiff: showed apartments, arranged inspections; collected, recorded, and deposited rent checks; and did maintenance work for the Salujas' properties. Defs.' SMF ¶ 9. Plaintiff, meanwhile, contends that while he did "at times" show apartments, handle move-ins, schedule inspections, and deposit rent checks on behalf of the Salujas, that work was done one week per month, and "most" of the Saluja work was on evenings and weekends, outside his hours of employment with Summit. Pl.'s Opp'n SMF ¶ 10. According to Plaintiff, he spent "very little time" during weekdays doing work for the Salujas, and even less time conducting this Saluja work at the Summit Apartments using a Summit computer. Id. Plaintiff claims that his work for the Salujas never "interfered" with his work for Defendants, and that all Saluja work done at the Summit office was "well within the time that he would have been expected to have for breaks." Id.

Plaintiff never advised Defendants, nor requested permission from Defendants, to work for other property owners while employed by Summit. Defs.' SMF ¶ 11; Pl.'s Opp'n SMF ¶ 11.

In March 2014, Plaintiff requested from Strait, and received, overtime authorization for maintenance employees to repair some of the vacant units at Summit Apartments to rent those units to tenants on a waiting list. Defs.' SMF ¶ 12–13; Pl.'s Opp'n SMF ¶ 12–13.

In June 2014, Strait terminated Plaintiff's employment with Summit. Defs.' SMF ¶ 14; Pl.'s Opp'n SMF ¶ 14. During the termination meeting, Strait told Plaintiff that there were too many vacant units at Summit Apartments. Defs.' SMF ¶ 15; Pl.'s Opp'n SMF ¶ 15.

Amy Donaldson, who is white, immediately replaced Plaintiff as the Property Manager at Summit Apartments. Defs.' SMF ¶ 17; Pl.'s Opp'n SMF ¶ 17. Plaintiff stayed on briefly (one day, per Plaintiff; until the end of the pay period, per Defendants) to help train Donaldson. Defs.' SMF ¶ 18; Pl.'s Opp'n SMF ¶ 18. Defendants also hired Donaldson's husband around this time, to work on maintenance, though the parties disagree about whether he was a Maintenance Lead. Defs.' SMF ¶ 20; Pl.'s Opp'n SMF ¶ 20.

Within two months of Plaintiff's termination, Summit Apartments was 100 percent occupied. Defs.' SMF ¶ 19; Pl.'s Opp'n SMF ¶ 19.

Plaintiff was subsequently employed in 2014 by National Heritage Academies, and in 2015 shifted to a position with the State of New York, which employed him as of January 12, 2018. Defs.' SMF ¶ 16; Pl.'s Opp'n SMF ¶ 16.

**B.  Protected Activity, Litigation, Alleged Retaliation, and Witness Intimidation**

On August 4, 2014 Plaintiff filed a charge of discrimination against Summit with the New York State Division of Human Rights ("NYSDHR"), which was cross-filed with the U.S. Equal Employment Opportunity Commission ("EEOC"). Defs.' SMF ¶ 21; Pl.'s Opp'n SMF ¶ 21.

Upon receiving a Right to Sue letter from the EEOC, Plaintiff filed this lawsuit, on October 5, 2015. Dkt. No. 1 ("Original Complaint"). Plaintiff filed an amended complaint in March 2016. Dkt. No. 17 ("Amended Complaint").

Throughout 2016, the parties engaged in document discovery, and in early 2016, depositions were conducted. Pl.'s SMF ¶ 7; Defs.' Opp'n SMF ¶ 7.

At some point after the Complaint was filed, Strait retained the services of Noah Felice, a private investigator. Defs.' SMF ¶ 23; Pl.'s Opp'n SMF ¶ 23; Pl.'s SMF ¶¶ 5–6; Defs.' Opp'n SMF ¶¶ 5–6. Plaintiff claims that Defendants hired Felice to investigate Plaintiff and obtain information that would support Defendants' defenses in this case, but Defendants dispute that characterization, and emphasize that Felice testified that Strait hired him to look into who stole some air conditioners from Summit. Pl.'s SMF ¶¶ 5–6, 10; Defs.' Opp'n SMF ¶¶ 5–6, 10. Defendants claim they engaged Felice as a private investigator based on the recommendation of Defendants' former counsel in this matter and were unaware that he was not a licensed private investigator and apparently had prior convictions for making false statements. Strait Aff. I ¶ 13.

Felice testified that he served Bates a deposition subpoena. Pl.'s SMF ¶ 9; Defs.' Opp'n SMF ¶ 9. Bates testified that she bumped into the person who served her the subpoena at Summit Apartments and that this person, whom the Court takes to be Felice, informed her that he was there to "talk to tenants . . . talk about [Plaintiff], ask them about [Plaintiff]." Dkt. No. 101-8 ("Bates Deposition II") at 2. While Bates couldn't remember specifics, she testified that Felice was asking tenants for "anything that will help him," and that Felice said that "[Plaintiff] was taking some stuff or stealing—I didn't pay attention that much." Id. at 2–3. Further, Felice "mention[ed] that they're giving some—I don't know if it's a reward, but the impression that I had is he's giving out something, you know." Id. Bates "wasn't sure if it was monetary, but

they're giving a kind of reward for anyone that could, you know, say something how [Plaintiff] was or what went on in the building." Id. at 3. The reward was "something of value." Id. at 9. Bates "assumed" that Felice was looking for negative information about Plaintiff, and had the "impression" that Felice was there to "get [Plaintiff]." Id. at 4.

Felice, meanwhile, in his deposition, testified to the following:

Q: [W]ere you authorized to offer rewards to anybody who had information about [Defendant]?
A: I was.
Q: By Mr. Strait?
A: Yes.
Q: What — what kind of a reward?
A: Cash rewards for any information leading to the arrest and conv[iction] of whoever. There was no specific name, it was just information that led to an arrest and conviction.

Dkt. No. 102-5 ("Felice Deposition I")[2] at 13–14. Felice testified that he did not end up paying any witnesses or giving them any "rewards," because nobody came forward "officially" to give a statement "on the record . . . in a court of law with an attorney present, a prosecutor, and a judge." Id. Per Felice, while tenants in off-the-record statements described Plaintiff raping them and stealing from their apartments, Summit employees never suggested that Plaintiff stole anything aside from air conditioners. Id. at 14–15. According to Felice, tenants were too scared of Plaintiff to come forward with formal on the record statements. Id. at 13.

Strait has admitted to ordering Donaldson to give money to Plaintiff's ex-wife, Dreamer Glen Johnson, "in the same time frame" as when Dreamer gave a written statement against Plaintiff in this case ("a few months later or maybe weeks"). Dkt. No. 93-13 ("Strait Deposition") at 10–13. Dreamer's statement asserted that Plaintiff himself was "racist,"

---

[2] Defendants depict Felice as an unreliable witness, pointing to multiple prior convictions for making false statements regarding his criminal history. Defs.' Resp. at 9. Felice, in his deposition, refused to provide information concerning his "[c]lassified top-secret" employment history without clearance from the "White House." Felice Dep. I at 25.

"abusive," and "could not stand working for white people." Dkt. No. 93-26 ("Dreamer Statement"). Dreamer also provided Defendants with tax returns that she filed jointly with Plaintiff for the years 2011–14. Dkt. No. 93-5 ("McIntyre Declaration") ¶ 14; Pl.'s SMF ¶ 20; Defs.' Opp'n SMF ¶ 20. In his deposition, Strait characterized the money to Dreamer as a "loan," which she "is repaying." Id. Donaldson meanwhile, "figured" the payment related to this litigation, "because why would Dreamer [], three years later or however many years later it was, appear?" Dkt. No. 93-20 ("Donaldson Deposition II") at 4–9.

Defendants deny offering or authorizing any sort of reward in connection with this case. Strait Aff. II ¶ 3; Defs.' Opp'n SMF ¶¶ 10–12.

Plaintiff also alleges that Defendants engaged in acts of intimidation with respect to Michael Brown, Donaldson, and Felice. Pl.'s SJ Mem. at 15–18. Before this lawsuit was brought, Brown told an NYSDHR investigator that Strait "made racial comments" about tenants, said a lot of racial stuff, and used the word "nigger" to refer to Plaintiff. Dkt. No. 93-17 ("NYSDHR Complaint") at 7. At his initial deposition, Brown testified that Strait had referred to Plaintiff as a nigger, but could not "remember" if he had told the NYSDHR investigator that Strait had made racial remarks about Plaintiff. Dkt. No. 93-18 ("Brown Deposition I") at 3; Dkt. No. 101-10 (Brown Deposition II") at 6–10.

At his second deposition, Brown testified that since his first deposition, someone, apparently Felice, had appeared at Brown's home, said "We want Lonnie," and mentioned a "reward." Dkt. No. 93-19 ("Brown Deposition III") at 2–10; Dkt. No. 93-16 ("Felice Deposition II") at 3–9. Brown stated that Felice appeared to have a gun at his side, though Brown said he was not "frightened." Brown Dep. III at 5–6. When Brown, at his wife's urging, eventually

declined to speak with Felice further, Felice "yelled out that [they] were going to regret this" and said that he was going to get Brown "in trouble." Id. at 10.

Plaintiff, in a declaration, states that Brown told Plaintiff that before Brown's deposition, Strait had told Brown that "[Brown] would be in trouble" and "urged [Brown] not to recall anything if he didn't want to have to testify in court, and that after his deposition, Defendant Strait angrily said to him that by recalling, [Brown] had just put himself on the witness stand." Dkt No. 93-3 ("Johnson Declaration I") ¶ 27. Brown has also testified, though, that Strait told him to "tell the truth." Dkt. No. 91-22 ("Brown Deposition IV") at 3–4, 7.

Meanwhile, Donaldson has testified that Strait spoke to her about hiring someone to kill Plaintiff. Donaldson Dep. II at 10–13. While Donaldson says she did not initially believe Strait, she "knew he was capable of whatever he wanted to happen," and became "even more nervous" after Strait's brother-in-law "stole" a gun from an apartment where the tenant was being evicted. Id. Donaldson called Plaintiff's attorney in April 2017 to inform her that Strait had told her he hired someone to kill Plaintiff. McIntyre Decl. ¶ 7. A police report was eventually filed. Dkt. No. 93-4 ("Police Report"). While Donaldson said in her deposition that no one told her not to testify in this case, she was "afraid" to give testimony because someone had "threatened or intimidated" her. Id. at 2.

The Police Report indicates that Felice informed the Syracuse police that Strait told him to "take care of" Plaintiff, which he interpreted to mean "kill" Plaintiff. Police Rep. at 9. During Felice's deposition, however, he denied making this statement to police, and said the detective had "an imagination." Felice Dep. II at 9.

Strait has denied that he ever told Donaldson that he had hired someone to kill Plaintiff, and further denies ever hiring, or attempting to hire, someone to kill Plaintiff. Dkt. No. 102-2

("Strait Affidavit II") ¶ 6. And to the extent Strait ever made a statement that could be interpreted as suggesting that he had hired someone to kill Plaintiff, Strait has said "it would only have been in a joking manner and solely out of frustration for having to spend time and money responding to Plaintiff's meritless claims in this case." Id. Plaintiff now admits that "[n]o evidence has been uncovered to prove that Defendant Strait actually hired someone to have Plaintiff killed." Pl.'s SJ Mem. at 17. Strait also denies engaging in witness intimidation or "ever authorizing Noah Felice or anyone else to engage in witness intimidation in this case." Strait Aff. ¶ 4.

While the issue of a murder-for-hire came to Plaintiff and counsel's attention in April 2017, McIntyre Decl. ¶ 7, the matter was not brought to the attention of the Magistrate Judge until seven months later, in January 2018, January 11, 2018 Docket Entry. As of January 2018, per the Police Report, the Syracuse Police Department already considered the "[c]ase closed." Police Rep. at 10. And according to Strait, he was never contacted by the Syracuse Police Department regarding these accusations. Strait Aff. II ¶ 7.

In September 2017, prior to alerting the Magistrate Judge about the police report, the parties stipulated to Plaintiff filing a second amended complaint. Dkt. No. 54 ("Stipulation"); SAC. In its answer to the Second Amended Complaint, Defendants brought three new counterclaims against Plaintiff for (1) breach of duty of loyalty and (2) violation of the faithless servant doctrine, based on Plaintiff's work for the Salujas; and (3) for conversion,[3] alleging Plaintiff purchased building materials using a Summit credit card and then sold those building materials to other contractors or third parties. Answer and Counterclaims ¶¶ 122–54.

---

[3] The Court does not detail here the facts underlying the conversion counterclaim, since Defendants do not oppose Plaintiff's SJ Motion as to that counterclaim, which the Court dismisses.

III.     **LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational juror could find in favor of the non-moving party. Ricci v. DeStefano, 557 U.S. 557, 586 (2009).

In assessing a motion for summary judgment, a court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in its favor." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted). "It is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" Curry v. City of Syracuse, 316 F.3d 324, 333 (2d Cir. 2003) (citation omitted).

When parties have filed cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Bronx Household of Faith v. N.Y.C. Bd. of Educ., 492 F.3d 89, 96 (2d Cir. 2007) (citation and internal quotation marks omitted).

IV.     **DISCUSSION**

**A. Plaintiffs' Retaliation Claims**

Defendants move for summary judgment and dismissal of Plaintiff's post-employment retaliation claims (Plaintiff's third, sixth, and ninth causes of action). Defs.' SJ Mem. at 5, 13–21; Defs.' Reply at 5–13. Plaintiff brings his retaliation claims under § 1981 and NYSHRL. The standard for assessing retaliation claims under these statutes is the same as that for

11

retaliation claims brought pursuant to Title VII. Carmody v. Village of Rockville Centre, 661 F.Supp.2d 299, 324 (E.D.N.Y.2009) (collecting Second Circuit cases).

Retaliation claims "are evaluated using [the McDonnell Douglas] three-step burden-shifting analysis." Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010). At the first step, "[i]n order to establish such a *prima facie* case,"

> a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find (1) that [s]he engaged in protected [activity] under [the anti-discrimination statutes], (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

Id. (alterations in original). An adequate *prima facie* showing "creates a 'presumption of retaliation,' which the defendant may rebut by 'articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action.'" Chen v. City Univ. of N.Y., 805 F.3d 59, 70 (2d Cir. 2015) (alterations in original) (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)). "If the defendant provides such an explanation, 'the presumption of retaliation dissipates,' and the plaintiff must prove 'that the desire to retaliate was the but-for cause of the challenged employment action.'" Id. (first quoting Jute, 420 F.3d at 173, second quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013)).

The first two prongs of a prima-facie retaliation claim are uncontested here: Plaintiff's protected activity consists of pursuing this racial discrimination lawsuit against Defendants, who obviously were aware of the suit.

As to the "adverse action" prong, Plaintiff alleges three different actions: (1) after depositions taken in October 2016, Defendants had investigator Felice speak with tenants at Summit Apartments, to tell people that Plaintiff had stolen from Defendants and to offer rewards to people who could provide information helpful to Defendants; (2) Defendants intimidated

Brown to alter his testimony;[4] and (3) Defendants brought "baseless" counterclaims in this suit, "falsely alleging theft and other wrongful acts by Plaintiff." Pl.'s Resp. at 13–21; SAC ¶¶ 57–66.

Defendants seek judgment as a matter of law primarily on the basis that these alleged actions cannot constitute "adverse" action because they are not "employment" actions. Defs.' SJ Mem. at 13–18. However, in 2006, the Supreme Court of the United States made clear that anti-retaliation provisions "extend[] beyond workplace-related or employment-related retaliatory acts and harm." Burlington N. v. Santa Fe R.R. Co. v. White, 548 U.S. 53, 67 (2006). To establish a retaliation claim, the challenged action must be "'materially adverse,' which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id., 548 U.S. at 68. This materially adverse action need not be employment-related. Id., 548 U.S. at 67. "'[P]etty slights, minor annoyances, and simple lack of good manners will not' give rise to actionable retaliation claims." Millea v. Metro-North R.R., 658 F.3d 154, 165 (2d Cir. 2011) (quoting Burlington N., 548 U.S. at 68). However, "alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." Tepperwien v. Entergy Nuclear Operations, 663 F.3d 556, 569 (2d Cir. 2011).

While an adverse action need not be an "employment" action, courts in the Second Circuit have found false accusations by an employer against a former employee, without more, insufficient to establish an adverse action. See, e.g. Giarrizzo v. Holder, No. 07-CV-801, 2011 WL 496945, at *6 (finding no adverse action despite "dozens of false accusations" against the former employee, because the plaintiff had failed to allege that he suffered any action that would

---

[4] In presenting Plaintiff's retaliation claim, the SAC and Plaintiff's Response make no mention of Strait's murder-for-hire discussions (allegations of which appear in Plaintiff's Sanctions Motion).

impact any future employment opportunity). In <u>Thompson v. Morris Heights Health Ctr.</u>, No. 09-CV-7239, 2012 WL 1145964, at *15–18 (S.D.N.Y. Apr. 6, 2012), the district court summarized the post-employment retaliation case law as follows:

> In the post-employment context, impermissible adverse action may be found where, for example, an employer provides an untruthful letter of reference for a former employee who complained of discriminatory conduct, "blacklists" or otherwise speaks ill of a former employee with retaliatory motive, or restricts an ex-employee's access to former co-workers in such a way as to hamstring future job prospects. By contrast, where a plaintiff has not established that the allegedly-retaliatory action hurt his or her job prospects, those actions have not been held retaliatory and claims premised on such acts have been dismissed.

<u>Id.</u>

To be clear, in light of <u>Burlington</u>, the Court cannot require that the adverse action be employment-related. However, the Court can consider the employment impact in assessing whether these false accusations might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. Evidently, other courts in the Second Circuit, post-<u>Burlington</u>, have found false accusations without a job impact insufficiently severe to constitute a materially adverse action.

Here, Plaintiff has offered no evidence that false accusations against him have impacted his employment opportunities. Indeed, the record shows that since the accusations (which occurred post-October 2016), Plaintiff has maintained employment with New York State. Dkt. No. 91-23 ("Johnson Deposition") at 3; Dkt. No. 91-26 ("Plaintiff's Responses to Defendants' First Set of Interrogatories") at 3. There may well be situations in which false accusations, on their own, are of sufficient severity to constitute materially adverse action. But the Court finds that alleged discussions here between Felice and tenants about Plaintiff stealing from Defendants do not constitute materially adverse action, and therefore cannot support a retaliation claim.

As to the alleged intimidation of Brown as a witness, Brown nevertheless gave testimony damaging to Defendants here, and Plaintiff has not, beyond conclusory comments about "tainted" testimony, suggested how the alleged intimidation of Brown would constitute a materially adverse action for Plaintiff. Therefore, the alleged intimidation of Brown cannot support a retaliation claim.

As to the last basis for Plaintiff's retaliation claims, "[t]he filing of counterclaims is only actionable as retaliation where the counterclaims are without any merit." Rosas v. Balter Sales Co. Inc., No. 12-CV-6557, 2015 WL 12915807, at *1 (S.D.N.Y. Mar. 30, 2015); see also Schanfield v. Sojitz Corp. of America, 663 F. Supp. 2d 305, 342 (S.D.N.Y. 2009) (partially granting an employer's motion for summary judgment on an employee's retaliation claim because there is "nothing in Title VII or any other anti-discrimination statute that should prevent an employer from bringing a legitimate claim against a current or former employee simply because that employee has complained about what the employee believes to be discriminatory behavior."); see also Jian Zhong Li v. Oliver King Enters., Inc., No. 14-CV-9293, 2015 WL 4643145, at *3-4 (S.D.N.Y. Aug. 4, 2015) ("Courts have held that instituting bad faith or groundless counterclaims or instituting bad faith litigation against the employee constitutes actionable retaliation.").

As discussed below, Defendants' counterclaims for breach of duty of loyalty and violation of the faithless servant doctrine have sufficient merit to survive Plaintiff's SJ Motion. Accordingly, those counterclaims cannot serve as the basis for Plaintiff's retaliation claim.

Defendants do not oppose Plaintiff's SJ Motion as to their counterclaim for conversion. Still, the deposition of Linda Niccum details at least some basis for Defendants claim of possible theft based on discrepancies between items purchased with Plaintiff's corporate credit card and

those installed in Summit apartments. Dkt. No. 93-21 ("Niccum Deposition") at 2–17.

Accordingly, the conversion counterclaim likewise cannot serve as a basis for Plaintiff's

retaliation claim.

Even when aggregated, the various actions alleged in support of the retaliation claims do

not constitute materially adverse actions. See Tepperwien, 663 F.3d at 572 (cautioning that with

regard to aggregated acts of retaliation that "[z]ero plus zero is zero"). Defendants' SJ Motion as

to Plaintiff's retaliation claims is therefore granted, and those claims are dismissed.

### B. Defendants' Counterclaims

Defendants move for summary judgment with respect to liability on their counterclaims

for (1) breach of duty of loyalty and (2) violation of the faithless servant doctrine. Defs.' SJ

Mem. at 5, 21-28; Defs.' Reply at 12–13. Plaintiffs move for summary judgment on these two

counterclaims, as well as Defendants' one other counterclaim, conversion. Pl.'s SJ Mem. at 18–

29.

#### 1. Conversion

As noted, Defendants do not oppose Plaintiff's SJ Motion as to Defendants' conversion

counterclaim. Defs.'s Resp. at 5 n.1. Accordingly, Plaintiff's SJ Motion is granted as to the

conversion counterclaim, which is dismissed.

#### 2. Breach of Duty of Loyalty and Violation of the Faithless Servant Doctrine

Breach of duty of loyalty and violation of the faithless servant doctrine are essentially the

same claims, except that under the faithless servant doctrine, the employer need not show that

the employee caused damages. Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp,

LLC, 813 F. Supp. 2d 489, 524 (S.D.N.Y. 2011) (citing Feiger v. Iral Jewelry, Ltd., 363 N.E.2d

350 (N.Y. 1977); see Schanfield v. Sojitz Corp. of Am., 663 F. Supp. 2d 305, 348 (S.D.N.Y.

2009 (noting that breach of duty of loyalty is "sometimes referred to as the 'faithless servant doctrine'"). "New York law with respect to disloyal or faithless performance of employment duties is grounded in the law of agency, and has developed for well over a century." <u>Phansalkar v. Andersen Weinroth & Co., L.P.</u>, 344 F.3d 184, 200 (2d Cir. 2003) (citing <u>Murray v. Beard</u>, 7 N.E. 553 (N.Y. 1886)). Under New York law, an agent is obligated "to be loyal to his employer and is 'prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" <u>Id.</u> (quoting <u>Western Elec. Co. v. Brenner</u>, 360 N.E.2d 1091 (1977)). "'One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary'" for the period of disloyalty. <u>Id.</u> quoting <u>Feiger.</u>, 363 N.E.2d at 351 (1977). It does not "'make any difference that the services were beneficial to the principal, or that the principal suffered no provable damage as a result of the breach of fidelity by the agent.'" <u>Id.</u>, quoting <u>Feiger</u>, 363 N.E.2d at 351.

New York courts apply two alternative standards to faithless servant claims. <u>Phansalkar</u>, 344 F.3d at 201. Under one standard, derived from <u>Turner v. Konwenhoven</u>, 2 N.E. 637 (N.Y. 1885), in order to make out a faithless servant claim, the employer plaintiff "must show (1) that the employee's disloyal activity was related to "the performance of his duties;' and (2) that the disloyalty 'permeated the employee's service in its most material and substantial part.'" Schanfield, 663 F. Supp. 2d at 348 (quoting <u>Phansalkar</u>, 344 F.3d at 200). Under this standard, "[l]ower New York courts have . . . found agents' disloyalty to be 'substantial' in a variety of circumstances. They have found disloyalty not to be 'substantial' only where the disloyalty consisted of a single act, or where the employer knew of or tolerated the behavior." <u>Phansalkar</u>, 344 F.3d at 201–02.

The New York Court of Appeals enunciated the second standard for a faithless servant claim in Murray, where it stated:

> An agent is held to *uberrima fides* [utmost good faith] in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment, it amounts to such a fraud upon the principal, as to forfeit any right to compensation for services.

Murray, 7 N.E. at 554. "New York courts have not reconciled any differences between [these two standards], or defined the circumstances, if any, in which one standard should apply rather than the other." Phansalkar, 344 F.3d at 202.

New York courts "have not specifically defined the 'material and substantial' standard, thereby leaving it to case-by-case determination whether the employee's conduct so far infringed on her job performance as to constitute a violation of the doctrine." Sanders v. Madison Square Garden, L.P., No. 06-CV-589, 2007 WL 1933933, at *4 (S.D.N.Y. July 2, 2007). Courts have found faithlessness where the employee competed with his employer and profited from one or more opportunities properly belonging to his employer. See Maritime Fish Prods. v. World-Wide Fish Prods., 474 N.Y.S. 281, 285 (N.Y. App. Div. 1984) (finding duty of loyalty breached where employee "surreptitiously organized a competing corporation, corrupted a fellow employee, and secretly pursued and profited from one or more opportunities properly belonging to his employer"); Murray, 7 N.E. 553 (1886) (finding faithlessness where a timber broker had undertaken competing obligations to different dealers).

Meanwhile, courts have found no faithlessness where an employee took steps toward competition, but never lessened his work on behalf of his employer. See Feiger, 363 N.E.2d at 351 (finding no faithlessness when the employee, despite taking preliminary steps to enter into competition with his employer "never lessened his work on behalf of the employer and never

misappropriated to his own use any business secrets or special knowledge"); Schwartz v. Leonard, 526 N.Y.S.2d 506, 508 (N.Y. App. Div. 1988) (finding no actionable disloyalty where the employee took client files and made secret plans to move to new office space, but where it had not been shown that he "neglected the files during his period of employment or that he was furthering his own interest at the expense of the [employer]"); Grewal v. Cuneo, No. 13-CV-6836, 2016 WL 308803, at *8 (S.D.N.Y. Jan. 25, 2016) (dismissing faithless servant claim for failure to allege that employee "took a material step to steal the firm's clients").

Reading the evidence here "in the light most favorable" to Defendants and drawing all inferences in their favor, Allen, 64 F.3d at 79, a jury could well find disloyalty permeating Plaintiff's duties, on the basis that Plaintiff "lessened" and "neglected" his duties for Defendants while engaging in competition. On this score, Plaintiff's own deposition is probably the most helpful to Defendants. Plaintiff has admitted to working as a "consultant" for Ravi and Gurbucksh Saluja for some of their Syracuse properties at the same time he was employed by Summit, without permission of Strait or Barcus, and to using Summit's office and computer to perform work for the Salujas. Johnson Dep. at 5–6, 8–10, 12, 15, 26–27. Plaintiff has admitted that on behalf of the Salujas, he collected rent, moved tenants in, showed units, set up inspections, and deposited rent. Id. at 6, 13. While Plaintiff has said that the times he worked for the Salujas "varied," and included evenings and weekends, he has admitted to "sometimes" doing work for Ravi during the day, and that "some" of the work for Ravi was during weekdays. Id. at 7, 11. Indeed, Plaintiff has admitted that he did work for Ravi during "some of the hours" that he was also working for Summit. Id. at 11. [5] And as far as Gurbocksh's tenants at one of his

_____

[5] Defendants also point, generally, to multiple years of Plaintiff's Summit desk calendars to further document the supposed pervasiveness of Plaintiff's work for the Salujas. Defs.' Reply at 13; 105-1 Dkt. No. 102-4 ("Desk Calendar"). However, Defendants do not point to specific

properties, 140 Washington Square, were concerned, Plaintiff has admitted that he was their property manager. <u>Id.</u> at 15.

Several other witnesses have also provided evidence that a jury could reasonably rely on in support of a finding of faithlessness. Gurbucksh provided a sworn affidavit stating that Plaintiff was the "property manager" for 140 Washington Square between 2011 and 2014, showed rental apartments "from time-to-time" and collected, recorded, and deposited rent checks received from his tenants. Dkt. No. 91-14 ("Gurbucksh Affidavit") ¶¶ 2–3. Gurbucksh's characterization of Plaintiff's role is bolstered by a March 2012 letter (apparently found on a Summit computer) from Plaintiff to Washington Square Tenants listing Plaintiff as "Property Manager." Dkt No. 91-23 at 28 ("Property Manager Letter"); Gurbucksch Aff. ¶ 2. And an e-mail exchange between Plaintiff's Summit e-mail address and a Washington Square tenant, shows weekday, mid-day timestamps. Dkt. No. 91-23 at 29 ("Plaintiff e-mail exchange"). Gurbucksh's son, Ravi, has also provided an affidavit, stating that Plaintiff performed services for his rentals between 2011 and 2014, showing apartments, and collecting, recording, and depositing rent checks. Dkt. No. 91-13 ("Ravi Affidavit") ¶ 2. And Elisa Bates, who preceded Plaintiff as Summit's property manager, has testified that Plaintiff took care of collecting and recording checks for Ravi and Gurbucksh, and Plaintiff used a Summit computer to record rents in a spreadsheet, and make photocopies of rent checks. Dkt. No. 91-19 ("Bates Deposition I") at 5–7.

---

dates or pages or examples of work done for the Salujas noted in the Desk Calendars. The movant must "identify[] those portions of the record" that demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). The Court will not sift through the voluminous calendars without more specific direction from counsel.

Yet another Saluja relation, Jatin, stated under oath that Bates, while still also employed by Summit, performed certain duties for Jatin's University Hill Apartments ("UHA"), which has forty-eight rental units. Dkt. No. 91-15 ("Jatin Affidavit") ¶¶ 1–2. Specifically, per Jatin, Bates showed apartments and collected, recorded, deposited rent checks from UHA tenants. <u>Id.</u> ¶ 2. And Bates has testified that while she was out of the country for a month, Plaintiff filled in for her in this role at UHA. Bates Dep. I at 6–8. During Bates's absence, Plaintiff also filled in collecting rent for a "house" belonging to Bates' friend, "Ank." <u>Id.</u> at 4–8.

In addition, Amy Donaldson has testified that when she started working at Summit in June 2014, Plaintiff "receive[d] phone calls for maintenance issues to buildings that were not part of Summit Apartments. And he said he was also running other apartments at the same time, so any maintenance calls for those addresses, just to disregard them." Dkt. No. 91-18 ("Donaldson Deposition I") at 4, 17.

In further support of a finding of disloyalty, Defendants' also claim that the Plaintiff's work for the Salujas directly aided competitors. Strait Aff, ¶ 12.

On the other hand, while there is no dispute that Plaintiff did "some" work for the Salujas during his time working for Defendants, the record, when read in light most favorable to Plaintiff, could lead a jury to reasonably conclude that disloyalty did not permeate Plaintiff's duties, and that he did not neglect his work for Defendants while engaging in competition. Plaintiff has explained that the hours he worked for the Salujas were "very minimal," and done during the evenings, lunch, and weekends, and therefore "did not interfere" with his work for Summit. Johnson Dep. at 25–27; Johnson Decl. I ¶¶ 12–13. Plaintiff has said that photocopying rent checks would take five minutes each month, and depositing checks another five minutes. Johnson Decl. I ¶ 12. Plaintiff has also declared that he "never" did any maintenance work on the

Saluja buildings, but instead would simply inform the Salujas if a tenant alerted him to a repair issue. Id. ¶ 14.

The depositions of Ravi, Gurbucksh, and Bates offer support for Plaintiff's characterization of his work for the Salujas as being minimal. In his deposition, Ravi describes how Plaintiff "helped [Ravi] just collecting some rents" on 611 Pond Street (a two-family residence) and 315 Oak Street (a building with four apartment units), and "that's all he did." Dkt. No. 101-13 ("Ravi Deposition") at 2–3, 5; Syracuse Department of Assessment, www.syracuse.ny.us/assessment; Johnson Decl. I ¶ 10. While Plaintiff might have shown a vacant Ravi apartment, there was "not much moving in and moving out." Id. at 3. And Ravi and his father would meet with Plaintiff around once per month, for just ten or fifteen minutes to get the checks and "go over the accounts." Id. at 5–6. While Ravi said that these meetings occurred at Summit "sometimes," they would be at the end of a weekday. Id. at 6. And while Plaintiff would manage maintenance, or "basic" building issues (though Ravi could not recall specific projects), Ravi stated that maintenance people from other Saluja buildings would actually do the maintenance work once Plaintiff notified the Salujas of the issue. Id. at 4–5, 8. The limited nature of Plaintiff's role is further bolstered by Ravi's testimony that Plaintiff was paid "a very small amount." Id. at 8. Gurbucksh's deposition likewise depicts a limited role for Plaintiff, describing how "Plaintiff never worked for [Gurbucksh]. He just collected rent and that's it." Dkt. No. 93-23 ("Gurbucksh Deposition") at 3. Plaintiff collected rent on just eight rental units for Gurbucksh, across two properties, at 221 Lodi Street and 140 Washington Square. Id. at 3.

Jatin's UHA property, which Bates managed, consisted of forty-eight units. Jatin Aff. ¶¶ 1–2. Bates testified that showing apartments, and collecting the rent for the UHA apartments (as well as one other single family rental) took her around five hours per month. Bates Dep. I at 5–6.

Meanwhile, the Saluja properties Plaintiff "managed" consisted of fourteen apartments. Johnson Decl. I ¶ 10. As Plaintiff managed fewer Saluja apartments, and performed work similar to Bates on Saluja properties, a jury could reasonably conclude that Plaintiff devoted even less than five hours per month to the Saluja properties.

And a jury could reasonably conclude that even a smaller portion of the hours Plaintiff devoted to Saluja properties were during his normal weekday working hours at Summit. Plaintiff has testified to doing some of his Saluja work on weekends and in the evening, consistent with Bates' understanding of the timing of such work. Johhnson Dep. at 7, 11; Bates Dep. I at 6. Such a small number of hours per month, without more, falls short of the misconduct found unfaithful in Phansalkar, where the employee's "misconduct occur[ed] in well over the majority of his areas of responsibility." 344 F.3d at 203, n.14, Even Plaintiff's email exchange with a 140 Washington Square tenant that Defendants submitted, read in a light most favorable to Plaintiff, is consistent with Plaintiff's argument that weekday work for the Salujas was minimal and could be fit in during work breaks. Plaintiff's email in the chain is time-stamped 12:31 p.m., a time when he might reasonably be on lunch break. Pl. Email Exchange.

There is also a genuine issue of material fact concerning whether Plaintiff's work for the Salujas was in competition with Defendants. While Strait declares that the Saluja properties were in direct competition, Strait Aff. ¶ 12, Plaintiff explains that the Salujas and Summit were not in competition, because each had a steady supply and in fact, a list of available Section 8 (public assistance) tenants, Johnson Decl. I ¶ 11; Dkt. No. 99 ("Johnson Declaration II") ¶¶ 4, 8. Plaintiff claims that Summit never lacked available tenants; rather, Summit units were vacant because "major work" had to be done to these units to pass a government-mandated inspection prior to them being re-rented. Dkt. No. 99 ("Johnson Declaration II") ¶¶ 3–4, 8. And Strait

acknowledged during his deposition that Summit had three hundred people on a waiting list for subsidized apartments. Dkt. No. 101-5 ("Strait Declaration") at 5.

Accordingly, the Court cannot say, as a matter of law based on the record before it, whether Plaintiff "faithfully performed his undertakings toward [D]efendants," Sundland v. Korfund Co., 20 N.Y.S.2d 819, 822 (N.Y. App. Div. 1940), or whether instead disloyalty "permeated the [Plaintiff]'s service in its most material and substantial part." Phansalkar, 344 F.3d at 200. The parties' conflicting characterizations of the extent of Plaintiff's work for the Salujas and its interference with work for Defendants, present a genuine dispute of material fact. Weighing the competing testimonies and other evidence to determine if disloyalty "permeated" Plaintiff's work for Defendants lies outside the Court's purview at the summary judgment stage. See Gallo v. Prudential Res. Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (explaining that a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them."). Accordingly, the Court will deny Plaintiff and Defendants' Summary Judgment Motions as to the Defendants' counterclaims for breach of duty of loyalty and faithless servant doctrine, since neither party can show entitlement to judgment as a matter of law.

### C. Motion for Sanctions

Plaintiff moves for default judgment to sanction Defendants for their alleged witness inducements and intimidation. Pl.'s SJ Mem. at 13–18. He asks for a hearing to resolve factual disputes relevant to the sanctions motion, at which Plaintiff "will seek to have a default entered against Defendants on Plaintiff's discrimination claim[s] and dismissal of all counterclaims against Plaintiff." Id. at 18.

The Federal Rules of Civil Procedure and the Court's inherent powers authorize it to sanction abuses of the litigation process, including witness tampering. Riley v. City of New York, No. 10-CV-2513, 2015 WL 541346 (E.D.N.Y. 2015) (citing Fed. R. Civ. P. 37 and Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991)). However, "dismissing a complaint or entering judgment against a defendant[ ] are severe sanctions, but they may be appropriate in 'extreme situations,' as 'when a court finds willfulness, bad faith, or any fault on the part of the' noncompliant party." Guggenheim Capital, LLC v. Birnbaum, 722 F.3d 444, 450-51 (2d Cir. 2013) (quoting Bobal v. Rensselaer Polytechnic Inst., 916 F.2d 759, 764 (2d Cir. 1990)). Even when a party has destroyed evidence, dispositive sanctions should only be used when lesser measures would not suffice to (1) deter similar conduct, (2) "place the risk of an erroneous judgment on the party who wrongfully created the risk," and (3) "restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). "Defaults are not favored, particularly when the case presents issues of fact, and doubts are to be resolved in favor of a trial on the merits." Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981).

Assuming that Plaintiff's allegations regarding Defendants' and Felice's behavior are true, he has not shown that it is appropriate to enter judgment against Defendants before trial. He argues that Felice's behavior caused him "extreme emotional distress" and "complicated and extended discovery in this case." Pl.'s SJ Mem. at 17. He also asserts (and presents evidence) that Felice's and Strait's threats made Brown and Donaldson, two of Plaintiff's witnesses, reluctant to testify. Id. at 16–17. However, other than broad statements that the alleged misconduct "tainted most, if not all, of Defendants' evidence" and "likely affected all testimony" from Donaldson, id. at 13, 17, Plaintiff does not present any evidence that Brown or Donaldson

are withholding information so crucial to his case as to warrant entry of default at this stage. Despite the alleged threats, both witnesses gave testimony damaging to Defendants at their depositions—Brown testified that Strait called Plaintiff a "nigger" and to Felice's threatening behavior, Brown Dep. I at 3; Brown Dep. II at 6–10; Brown Dep. III at 2–10; and Donaldson testified that Strait talked about killing Plaintiff, Donaldson Dep. II at 10–13. Plaintiff does not allege that either witness is refusing to testify at trial.

In these circumstances, default judgment would be inconsistent with the preference for trying the merits and unnecessary to cure the effects of the alleged misconduct (even if proven) and deter its repetition. See Riley v. City of New York, WL 541346, at *12 (E.D.N.Y. Feb. 10, 2015) (finding adverse inference instruction sufficient to "counteract[] any prejudice to [the moving party] resulting from the witness tampering, while still allowing [the non-moving party's] case to proceed on the merits"). While the Court will not now rule on evidentiary matters, Plaintiff may seek to introduce at trial evidence of Defendants' alleged inducements or threats as a means to impeach witnesses at trial, see F.R.E. §§ 607–608, or as evidence of consciousness of guilt on the part of Defendants. Monetary sanctions and non-dispositive (but still severe) remedies—for example, instructing the jury regarding adverse inferences it may draw from any proven tampering—may also suffice. Riley, 2015 WL 541346.

Such sanctions may be warranted if Plaintiffs prove the alleged threats and inducements. However, the parties have not addressed the amount or propriety of these less drastic sanctions in their briefs. In addition, their equities will depend on the evidence adduced at trial, including testimony from Brown, Donaldson, and Felice. Accordingly, the Court finds it most appropriate to deny the Motion for Sanctions now, granting Plaintiff leave to move for remedial and/or monetary sanctions at or after trial. In addition, if Plaintiff believes he has grounds for a motion

*in limine* to preclude any particular evidence based on Defendants' alleged misconduct, he may also file such a motion at the appropriate time.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' SJ Motion (Dkt. No. 91) is **GRANTED** as to Plaintiff's retaliation claims, which are **DISMISSED**, but **DENIED** in all other respects; and it is further

**ORDERED**, that Plaintiff's SJ Motion (Dkt No. 93) is **GRANTED** as to Defendants' conversion counterclaim, which is **DISMISSED**, but **DENIED** as to Defendants' other counterclaims, which survive; and it is further

**ORDERED**, that Plaintiff's Sanctions Motion (Dkt No. 93) is **DENIED**, but Plaintiff is granted leave to renew its motion for sanctions at or after trial; and is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order upon the parties in this action.

**IT IS SO ORDERED.**

DATED:     March 29, 2019
           Albany, New York

Lawrence E. Kahn
U.S. District Judge